THE PROSPECT PARK AND CONEY ISLAND RAILROAD COMPANY, RESPONDENT, *v.* THE CONEY ISLAND AND BROOKLYN RAILROAD COMPANY, APPELLANT.

*Specific performance of a contract made under different conditions from those existing when specific performance is demanded — competitors for business — condition as to use of steam, how affected by the use of electricity.*

The Prospect Park and Coney Island Railroad Company, which conducted a railroad *via* Vanderbilt and Ninth avenues, in Brooklyn, from Fulton ferry to a depot at Ninth avenue and Twentieth street, a point known as "Culver's," also owned a franchise, not used, for a road to the same depot from Hamilton ferry, *via* Fifteenth street and Ninth avenue. From "Culver's" it carried passengers to Coney Island by an ordinary steam railroad.

The Coney Island and Brooklyn Railroad Company operated a horse railroad from Fulton ferry over certain streets, and over Ninth avenue to Fifteenth street, from which point it ran to Coney Island to a terminus near that of the Prospect Park and Coney Island Railroad Company. It also operated another horse railroad from Hamilton ferry, over Hamilton avenue and Fifteenth street to Ninth avenue, where it joined its first line.

In this state of competition of their respective roads the companies, in 1882, entered into an agreement, to last twenty-one years, by which the first-mentioned company granted to the second a right to use its tracks on Ninth avenue, from Fifteenth to its depot at Twentieth street (Culver's), free of rent, which agreement provided that the license should not interfere with the operation of the Vanderbilt Avenue line. And the second-named company agreed to run its cars, except in winter, to "Culver's," from both Fulton and Hamilton ferries; and, further, that if at any time it used steam on the southerly part of its route, from Fifteenth street to Coney Island, the agreement might, at the option of either party, upon six months' notice, be terminated.

In May, 1887, the Prospect Park and Coney Island Railroad Company sold its Vanderbilt Avenue line and all its franchises to the Atlantic Avenue Railroad Company.

In 1890 the Coney Island and Brooklyn Railroad Company changed the motive power of the southerly portion of its road from Fifteenth street, south, to Coney

Island, to electricity; no longer ran its cars from the ferries to " Culver's," but ran all cars to the depot of its electric road at Fifteenth street, known as Prospect park.

In an action brought by the Prospect Park and Coney Island Railroad Company to compel a specific performance of the agreement, and to compel the defendant to continue to bring passengers from the ferries to "Culver's," evidence was given tending to show that after the defendant adopted electricity its operation at "Culver's" was materially impeded by the plaintiff, and that its earnings decreased materially.

*Held,* that it was improper to decree specific performance.

That the agreement was made under different conditions from those existing at the time of the commencement of the action, and when the companies were virtually competitors only as to city business.

That while the use of electricity, generated by steam, was not, perhaps, the "use of steam as a motive power," within the strict wording of the contract, yet its employment resulted in rapid transit upon the southern portion of the defendant's road, and made the companies competitors over the entire extent of their routes.

That a further reason why specific performance should not be decreed was that at "Culver's" the defendant was practically subordinated to the time table, and to the operation generally of the plaintiff's road, and that it sufficiently appeared that the facilities given the defendant at Culver's had been greatly diminished by the Atlantic Avenue Railroad Company, which had purchased the Vanderbilt Avenue line, subject to the defendant's rights, from the plaintiff, entailing serious loss to the defendant. (BROWN, J., dissenting.)

APPEAL by the defendant, the Coney Island and Brooklyn Rail road Company, from a judgment of the Supreme Court, entered, after a trial at the Kings county Special Term, in the office of the clerk of the county of Kings in January, 1892, directing the defendant to specifically perform a certain contract made with the plaintiff, and further enjoining it from operation unless it should run during the spring, summer and fall months of every year until June 1, 1903, cars to the plaintiffs depot at Ninth avenue and Twentieth street, in Brooklyn, connecting with the defendant's cars, from the Hamilton and Fulton ferries, so as to connect with the plaintiff's trains to and from Coney Island.

The facts relating to the two roads and their routes are fully set forth in the opinion. It further appeared, however, in the appeal papers that in May, 1887, the Prospect Park and Coney Island Railroad Company sold its Vanderbilt Avenue line and all its franchises to the Atlantic Avenue Railroad Company.

*William N. Dykman,* for the appellant.

*George W. Wingate,* for the respondent.

PRATT, J.:

The plaintiff owned or controlled the following franchises for passenger travel, between Brooklyn and New York ferries and Coney Island, on and prior to June, 1882 : One for a horse railroad from Fulton ferry *via* Park, Vanderbilt and Ninth avenues, to a depot at Ninth avenue and Twentieth street, Brooklyn, generally known as "Culver's." The other, also, for a horse railroad from Hamilton ferry *via* Fifteenth street and Ninth avenue, to said depot. The road was built and operated by plaintiff on the former line, called the Vanderbilt Avenue line. The latter franchise had not been practically used. From this depot (Culver's) it carried passengers, by an ordinary surface road, to Coney Island, at West Brighton, its cars being drawn by locomotive steam engines.

The defendant owned and operated two lines of horse cars ; one from Fulton ferry, by way of Smith, Jay and Ninth streets, to Ninth avenue, and thence, *via* Ninth avenue, to Fifteenth street, where it turned off towards Coney Island and ran down the old Coney Island road to Coney Island, where it turned westward and terminated near the terminus of plaintiff's steam road. The other from Hamilton ferry, through Hamilton avenue, *via* Fifteenth street, to Ninth avenue, where it joined its former line, and thence its passengers were carried over "the southerly portion" of its own line to Coney Island.

It is thus apparent that defendant's line, while in competition with plaintiff's lines, was, nevertheless, practically limited to city business, for it ran within five blocks of plaintiff's depot, and its passengers would there leave its cars and take the plaintiff's "rapid transit," getting over the five blocks as best they might. Defendants were, therefore, in a certain sense, a feeder to plaintiff's steam road, unless it adopted some method of rapid transit on the southerly portion of its line. Plaintiff had made an arrangement with the Iron Steamboat Company, by which its excursion tickets were good over its steam and horse car road, to bring passengers from Coney Island to Fulton ferry ; but the defendant was, nevertheless, bound to make some user of its franchise from Ninth avenue to Coney Island in order to save it, but at little, if any, profit.

It was, therefore, apparent that both parties would be gainers, and the public as well, if defendant was enabled, for the time being,

at least, to carry its passengers over these five blocks, and deliver them at plaintiff's steam railway depot.

With this idea in view, the two companies entered into the contract which plaintiff seeks now to have specifically performed by our decree. It provides that from June 1, 1892, for a term of twenty-one years, the defendant *may use* plaintiff's tracks on Ninth avenue, from Fifteenth street to its depot (Culver's), free of all charge for rent, repairs or alterations, but that such license should not interfere with plaintiff's stands for its own cars, or the operation of its own road, by which was intended the Vanderbilt Avenue line. The defendant covenanted that it would run its horse cars to this depot, and therefrom to Fulton and Hamilton ferries, respectively, by time tables prepared by plaintiff, so far, at least, as the Ninth Avenue lines were, in common, during the spring, summer and fall months. The plaintiff covenanted to construct certain additional facilities at or about its depots for defendant's exclusive use, and that its own cars should not, unnecessarily, interfere with defendant's, and to pay the cost of these additional facilities. It was also agreed that the tickets issued by the Iron Steamboat Company, taken from passengers on plaintiff's steam trains, should be good over defendant's lines, the plaintiff accounting to defendant for its part of the holder's transportation. This contract also provided that if defendant, at any time, used or permitted steam as a motive power on the southerly end of its line, then, on six months' notice, the contract should be terminated at the option of either party, and in that event the plaintiff would repay defendant the cost of said additional terminal facilities at the Culver depot.

We think it apparent that the plain purpose of this contract, so far as it affected the parties thereto alone, was to avoid competition for through Coney Island travel, to enable plaintiff to obtain the benefit of defendant's Hamilton Avenue line with, perhaps, its better facilities from Fulton ferry, as a feeder for its steam road, to save the necessity of building its proposed road to Hamilton ferry; and that it was to continue only so long as the two companies were not competitors for the through Coney Island travel, and that it should terminate when they again came into practical rapid transit competition. True, the power of this limitation is expressed with refer-

ence to steam as motive power, but that form of expression, as it seems to us, was used only because steam was then the only means in practical use as a motive power for rapid railway travel. The central thought of these parties in this respect was the avoidance for the time being of competition *by any means* on those portions of their lines which were practically adjacent, viz., "the southerly portion of defendant's line, as compared with that part of plaintiff's line which ran from Culver's depot to the island." It can scarcely be said that they intended to exclude the use of a cable propelled by steam power; for, in that case, the steam would be an active agent in energizing the otherwise inert cable. The distinction between locomotive steam as power and steam as motive power on railroads was recognized so far back as 1871 (see chap. 609 ; see, also, *Stranahan* v. *Sea View Ry. Co.*, 84 N. Y., 313 ; *People ex rel. Third Ave. R. R.* v. *Newton*, 48 Hun, 477), and it is a fact that this distinction had been drawn by the Court of Appeals in the Sea View Railroad case in March, 1881. (84 N. Y., 313.) And yet it would occasion quite as much surprise to find that these parties thought of a steam cable system as of electricity when they made this contract. We repeat that the use of the term "steam" as motive power seems only another form of referring to rapid transit, by whatever power accomplished, as means of bringing these parties into competition on the southerly part of their lines. In this view it seems to us that the steam used by defendant in generating the electricity used in its trolley or overhead system, is fairly within the contemplation of the parties. But, as already indicated, we do not base our judgment on that alone.

Again, we think that the changed circumstances of the parties render it inequitable that the extraordinary remedy of specific performance should be applied. While it is true that there is no covenant on the part of plaintiff to maintain the *status quo* of the contract, it still plainly contemplated that the plaintiff should continue to operate the Vanderbilt Avenue line, and that there should be no greater rivalry for the passenger traffic between the Culver depot and Fulton ferry than that which would naturally result from plaintiff's desire to work in harmony with defendant, and within the spirit of its covenant that its cars and track should be so operated as not unnecessarily to interfere with defendant's. So long as that relation existed the plaintiff was directly interested to avoid

conflict and to be fair in all its terminal arrangements as means to an end, viz., the increase of traffic for its own road; and this personal interest might well have been relied on by defendant as means of securing a generous, at least, a fair arrangement of running times, departures, arrivals, etc. Indeed, as already remarked, the contract subordinated defendant to time tables prepared by plaintiff for those five blocks, and that, of course, affected the whole of both its lines. But the plaintiff afterwards sold out its Vanderbilt Avenue line to a rival street railway company; and the evidence pretty plainly shows that the defendant was thereafter materially obstructed in its own terminal facilities at the Culver depot by the acts of this new owner and operator of that line. Without intending any reflection upon the management of this new operator of that line, it was but natural that it should consult its own convenience to a greater degree, or rather that it should not consult defendant's convenience to the same extent, as it would have been to plaintiff's interest to do if it had remained the owner and operator of the Vanderbilt Avenue line. Nor was this complaint purely technical or insignificant. The evidence fairly shows that defendant's earnings were materially and immediately decreased after that change, and it is difficult from the evidence to attribute that decrease to any other cause than the preference exhibited by travelers for the Vanderbilt Avenue line arising out of defendant's inability to start and progress its cars with the same promptness and frequency as when plaintiff controlled the terminal facilities.

We think that the spirit of this contract was that defendant should not be subjected to the temptations of greater rivalry in this respect than that which existed immediately when the contract was made. It subjected its entire business at that point, which had practically become the eastern terminus of both its lines, even to the time table of plaintiff. This was a subordination having its origin in personal confidence predicated on identity of interest and common purpose. But by this change defendant was subjected to the time table arrangements made by a stranger, a business rival who was under no restraint, or, if under any, it was not predicated upon the same guaranty for fairness. And the best evidence of the change is the decreased earnings of defendant's business. And it would seem to have been the object of this action to fasten just this subordination

upon defendant, unless we have mistaken the object of some of plaintiff's requests for findings.

Thus the plaintiff has deprived defendant of a material and valuable part of the plain consideration of this contract, and yet it seeks the extraordinary remedy of specific performance to enforce its side of the bargain when it can no longer give that which it promised, or, at least, created the expectation that it would give.

Perhaps it may be thought that we have gone too far in predicating judgment upon the assumed fact of actual and serious damage to defendant upon these terminal inconveniences and disappointments. But the result will be the same in any view, because defendant requested findings on these points which the court refused manifestly, for the reason that it deemed them immaterial. We think they were material, and that if the fact had been found, according to defendant's contention, it would alone have been an answer to the plaintiff's right to require specific performance of such covenants as these were.

We, therefore, direct a new trial, with costs of this appeal to the defendant to abide the event.

BARNARD, P. J. :

The condition under which the parties contracted are as completely changed as if the defendant used steam as a motive power. A covenant not to use steam would not be broken by the use of electricity; but when the use of electricity made the roads competing as fully as if propelled by steam, and the use of steam made the contract terminable by either party, the use of electricity is within the spirit of the contract. The conditions are changed in other respects so as to render the specific performance inequitable, by reason of, and in consequence of the sale of the plaintiff's road to the Atlantic Avenue Railroad Company.

The judgment should be reversed and a new trial granted, costs to abide event.

BROWN, J. (dissenting) :

The contract between the parties, which was dated June 1, 1882, so far as material to the questions presented upon this appeal, provided as follows :

(1) The plaintiff granted to defendant the right to use its railroad tracks on Ninth avenue, in the city of Brooklyn, from Fifteenth street to the plaintiff's depot at Greenwood Cemetery, for the term of twenty-one years free of charge, and agreed to construct, at defendant's expense, all new tracks, stands, sidings, switches and turnouts necessary to facilitate the operation of defendant's road.

(2) Defendant agreed to operate and run cars to the plaintiff's depot during the spring, summer and fall months to connect with all ferry boats at Hamilton ferry, and to run on same time table as plaintiff to Fulton ferry, connecting with all trains at said depot to and from Coney Island.

(3) It was mutually agreed that the agreement might be terminated by either party upon six months' notice, if, at any time during the term thereof, the defendant should use or permit the use of steam as a motive power on its road between Coney Island beach and Ninth avenue and Fifteenth street, in the city of Brooklyn.

At the time of making the agreement the plaintiff owned and operated a steam railroad to Coney Island from Brooklyn, having a depot at Ninth avenue and Twentieth street. It operated a horse road from the depot to Fulton ferry, and also possessed a franchise to construct a horse road from its depot aforesaid to Hamilton ferry.

The defendant owned a horse road from Coney Island to Brooklyn, having one terminus at Fulton ferry and another at Hamilton ferry.

The agreement was performed by defendant until January 1, 1890, when, having reconstructed its road from Prospect park to Coney Island so as to operate it with electricity, it ceased running its cars from the ferries to plaintiff's depot, and ran them all to its own depot at Prospect park.

The court found, as a fact, that plaintiff had fully performed the agreement on its part, and enjoined defendant from operating any of its cars, unless, during the spring, summer and fall months of the remainder of the term of the agreement, it either ran its cars to plaintiff's depot, making the connection as provided in the contract, or should run detached or "jigger" cars from its main line at Ninth avenue and Fifteenth street to said depot, and so operate them as to connect with cars on the main line, and transport to the depot all passengers, who so desired, without delay, inconvenience or expense.

I am unable to agree in the construction put upon the contract by my associates, to the effect (1) that steam used in generating electricity used in defendant's trolley system is fairly within the meaning of the provision which permitted either party to terminate the contract when defendant should use steam as a motive power on that part of its road between Coney Island and Ninth avenue and Fifteenth street, or (2) that it was within the contemplation of the parties and the fair meaning of the contract, that plaintiff should continue to operate the Vanderbilt Avenue line, and that there should be no greater rivalry for passenger traffic between the Twentieth street depot and Fulton ferry than that which would naturally result from plaintiff's desire to work in harmony with defendant.

The use of steam as a motive power did not, *ipso facto*, terminate the contract. The provision was permissive only, and there is no evidence that defendant ever served the notice required, or ever claimed that the condition was created which permitted its termination. In view of the recent decision of the Court of Appeals in the case of the *Hudson River Telephone Company* v. *Watervliet Turnpike and Railroad Company* (48 N. Y. St. Rep., 417), it would seem unnecessary to argue that the propulsion of cars by electricity was not using steam as a motive power. In that case defendant was authorized by law to propel its cars by the use of " any mechanical or other power, except *steam*." It adopted and used electricity, applying it by the overhead trolley system, and it was held that it was acting within its authority.

The conclusion that the defendant should continue to operate the Vanderbilt Avenue line is not based upon any express provision of the contract, nor do I think it can be fairly implied from anything contained in the agreement, or in the situation of the parties at the time the contract was entered into.

No greater reason exists for this conclusion than for one that it was contemplated that plaintiff should not sell or operate the Hamilton Avenue road.

The defendant knew that the plaintiff possessed the Hamilton Avenue franchise and offered to purchase it, and, of course, it knew that plaintiff was operating the road to Fulton ferry.

The sale of the Hamilton Avenue franchise was refused unless defendant purchased both lines. This, it appeared, it was unwilling

to do.   At the time of making the contract the parties were, therefore, actual competitors for the travel to and from Fulton ferry, and prospective competitors over the Hamilton Avenue route.   And as the contract contains no covenant that plaintiff would not operate both of these routes, it must be assumed that such a contingency was within the contemplation of both parties when the agreement was made.

The conclusion that the rights of the defendant were impaired by the sale of the Atlantic Avenue road is opposed to the findings; that the sale was made subject to the defendant's rights, and that plaintiff had fairly performed all its obligations of the contract. These findings have evidence to support them, and in the absence of a certificate that all the evidence is contained in the case are not subject to our review. (*Halpin* v. *Phœnix Ins. Co.*, 118 N. Y., 165; *Aldridge* v. *Aldridge*, 120 id., 614.)

There was no legal obstacle to the sale to the Atlantic Avenue Company, and unless it violates some provision of the contract was not a thing which constituted a defense to this action.

That it was not considered as violating or impairing defendant's legal rights under the contract is conclusively shown by the fact that defendant never made any objection to it, but, on the contrary, continued without complaint to perform its contract for four years after the sale was made.

It is also claimed that the contract is not one of which the court should decree specific performance.   That the situation has materially changed since the agreement was made, and that the plaintiff should be left to his remedy at law.

The discretion which courts of equity exercise to decree or deny specific performance in cases of this character is not an arbitrary or capricious one.   It rests upon well-settled rules of equity procedure. Where the contract is a fair one, and the situation, at the time when specific performance is asked, is one which the parties may fairly be said to have contemplated or foreseen, and where performance inflicts no undue hardship on the defendants, and gives no undue advantage to the plaintiff, and where the construction of the instrument is clear, and the breach clear, then performance must be decreed, and the court would not be justified in refusing it.

But when, for causes not chargeable to the defendant, an enforcement of the agreement would work an injustice, or defeat the ends

contemplated by the parties, or when the surroundings of the property have materially altered, or the situation of the parties, with reference to the subject-matter of the contract, has so changed that the covenant sought to be enforced is not applicable to the state of things existing at the time of the trial, and would cause no benefit to the plaintiff, and impose a hardship on the defendant — in such a case a decree for performance may be denied, and the plaintiff left to pursue his remedy for damages.

As bearing upon the changes in the situation of the parties to this action, two facts are referred to : (1) The sale to the Atlantic Avenue Company of the plaintiff's horse car lines, and their operation by that company; and, (2), the introduction of electricity as a motive power on railroads.

The first fact needs no consideration for the reason, already pointed out, that it was a thing within the contemplation of the parties at the time of making the contract. And there is no finding that either plaintiff or the Atlantic Avenue Company violated the contract. The introduction of electricity as a motive power operates in this case solely to benefit the defendant and affords it no ground to refuse to perform its contract obligation. The parties, at the date of the agreement, each owned a road between Brooklyn and Coney Island, but by reason of the defendants being a horse road exclusively, it could not successfully compete with the plaintiff. The agreement was beneficial to the defendant in that, by it, it was enabled to enjoy part of the travel between the two places.

By the use of electricity defendant is now enabled to successfully operate its road to Coney Island, south of Prospect park, and carries passengers at a less rate of fare than plaintiff does upon its steam road, and it has obtained a large part of the travel which has been diverted from plaintiff's road. The decree made in this case does not interfere with this operation of defendant's road. It is left free to use electricity as a motive power, and to operate its road to Coney Island and take up passengers along its lines in the city and carry them to its depot at Prospect park, but it compels it to deliver, at plaintiff's depot, such passengers as use its horse roads in the city, and desire to take the steam road to the island. This it is permitted to do by using transfer or "jigger" cars on Ninth avenue from Fifteenth street to the depot.

The evidence of the case discloses no reason why it should not perform that obligation, and to permit it to violate its agreement and divert all the travel over its horse road to its own electric cars would give to it all the benefits arising from the use of this new motive power and impose all the hardships upon the plaintiff.

I am of the opinion that the covenant sought to bo enforced is applicable to the present situation of the parties and should be enforced, and, consequently, the judgment should be affirmed, with costs.

Judgment reversed and new trial granted, costs to abide event.